UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

SUNCOAST WATERKEEPER,

     Plaintiff,

       v.

U.S. RECYCLING COMPANY,

     Defendant.

Civil Case No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

     Plaintiff SUNCOAST WATERKEEPER, by and through its counsel, hereby alleges:

**I.    JURISDICTION AND VENUE**

    1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

    2.    On October 3, 2025, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant

("notice letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region 4; the Secretary of the Florida Department of Environmental Protection ("DEP"); the Director of the Northeast District of the DEP; and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of Florida has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Middle District of Florida pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.    <u>INTRODUCTION</u>

5.      Defendant discharges polluted storm water from a scrap and concrete recycling and concrete manufacturing facility located in Sarasota, Florida. The facility is operating in violation of the Clean Water Act and the State of Florida's Multi-Sector Generic Permit for Storm Water Discharge Associated with Industrial Activity.

6.      Florida's Multi-Sector Generic Permit is a National Pollution Discharge Elimination System ("NPDES") permit required under the Act that is issued by the DEP under the authority of Florida Statute Section 403.0885, which authorizes Florida to implement the NPDES program pursuant to authority delegated to the State of Florida by the EPA. Pursuant to Florida Administrative

Code ("F.A.C.") Rule 62-621.300(5)(a), Florida adopted the EPA's original Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804), and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534), September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively referred to as the "MSGP"). Defendant's violations of the substantive and procedural requirements of the MSGP and the Act are ongoing and continuous.

7.    With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. In most of the Sarasota area, storm water flows untreated either directly, or through municipal storm drain systems into Sarasota Bay and its tributaries. Storm water picks up industrial pollutants and typically discharges them directly into nearby waterbodies or indirectly via storm sewer systems. Discharge of storm water from areas where industrial activities occur can contain toxic pollutants when facility practices allow exposure of industrial materials to storm water. This increased flow and pollutant load can impair waterbodies, degrade biological habitats, pollute drinking water sources, and cause flooding and hydrologic changes to the receiving water, such as channel erosion. Storm water pollution accounts for a substantial portion of the pollution entering the Sarasota Bay watershed each year. The effects of nonpoint source pollutants on specific waters vary and may not always be fully assessed. Storm water pollution poses a health risk to humans, harms marine life, contaminates water bodies, and harms the environment. These contaminated storm water discharges can and must be controlled for the Sarasota Bay watershed to regain its health.

8.    High concentrations of total suspended solids ("TSS") degrade

optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      Sarasota Bay area waters are ecologically sensitive estuarine systems with special aesthetic, economic and recreational significance for people living in the surrounding communities. Included amongst these resources are specially recognized and designated Outstanding Florida Waters, pursuant to 62-302.400 F.A.C., as worthy of special water quality protections because of their natural attributes. Portions of Hog Creek, which receive toxic metals and other contaminants in storm water discharges from Defendant's industrial activities are listed on the State of Florida's Clean Water Act Section 303(d) list of impaired water bodies. A water body that is listed as impaired cannot support its designated beneficial uses. The beneficial uses of the waters that receive pollutants from Defendant's industrial stormwater discharges include aquatic life (estuarine and freshwater habitat, fish migration, fish spawning, preservation of rare and endangered aquatic species, shellfish propagation,) primary contact and recreation, navigation, and fish consumption.

10.      Sarasota Bay area waters provide essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water contaminated with sediment, heavy metals, and other pollutants harm the

special aesthetic and recreational significance that Sarasota Bay area waters have for people in the surrounding communities. The public's use of Sarasota Bay area waters for recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation exposes many people to toxic metals and other contaminants in storm water discharges and impairs those activities.

III.    **PARTIES**

11.    Plaintiff Suncoast Waterkeeper ("Waterkeeper") is a non-profit public benefit corporation with members throughout Southwest Florida, including Pinellas, Hillsborough, Sarasota, Manatee, and Charlotte Counties.  Waterkeeper is dedicated to protecting and restoring the Florida Suncoast's waterways on behalf of its members through enforcement, fieldwork, advocacy, and environmental education for the benefit of the communities and Waterkeeper's members that rely upon these precious coastal resources. To further its mission, Waterkeeper actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. Waterkeeper has been registered as a non-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time. Waterkeeper is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 350 separate Waterkeeper programs.  Waterkeeper's office is located in Sarasota, Florida.

12.    Members of Waterkeeper use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of Waterkeeper use those waters for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of Waterkeeper's members have been,

are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the MSGP. The relief sought herein will redress the harms to Waterkeeper caused by Defendant's activities.

13.    Plaintiff brings this action on behalf of its members, respectively. Plaintiff's interest in reducing Defendant's discharges of pollutants into Sarasota Bay and its tributaries and requiring Defendant to comply with the requirements of the MSGP are germane to Waterkeeper's purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Waterkeeper.

14.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

15.    Defendant U.S. RECYCLING COMPANY ("U.S. Recycling") is a corporation that owns and/or operates the industrial facility located at 1310 Industrial Court, Sarasota, FL 34236 ("Facility").

## IV.    STATUTORY BACKGROUND

### Clean Water Act

16.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

17.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). It authorizes the EPA to issue NPDES permits directly and also to delegate the authority to issue NPDES permits to state agencies.

18.    States with EPA-approved NPDES permit programs are authorized

to regulate industrial storm water discharges through individual permits issued to dischargers or through general permits that cover a category of dischargers. 33 U.S.C. § 1342(p).

19.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized the DEP to issue NPDES permits including general NPDES permits in Florida.

20.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties up to the statutory maximum, currently $68,445 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

**<u>Florida's MSGP</u>**

21.    The DEP elected to issue the MSGP as the statewide general permit for industrial storm water discharges. Thus, Florida has a single, statewide general permit applicable to all industrial storm water dischargers.

22.    In order to discharge storm water lawfully in Florida, industrial dischargers must obtain coverage under and comply with the terms of the MSGP or obtain and comply with an individual NPDES permit. 33 U.S.C. § 1311(a).

23.    The MSGP contains a variety of substantive and procedural requirements that all dischargers must meet.

24.    Part XI.N of the MSGP pertains to Sector N facilities. These are facilities that possess a Standard Industrial Classification ("SIC") Code of 5093. Sector N facilities discharge storm water associated with industrial activity from scrap recycling and waste recycling facilities. In addition to the general

requirements that the MSGP imposes on all dischargers, Part XI.N of the MSGP imposes certain additional specific terms and conditions on Sector N Facilities.

25.    The MSGP is built on the expectation that its requirements will predominantly be met through a permittee's use of best management practices ("BMPs"). BMPs can take a wide variety of forms, from frequent sweeping to making structural modifications such as roofing or installing storm water filtration and treatment, as necessary.

26.    The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ." 33 U.S.C. § 1311(b)(2)(A). The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants." *Id.* at § 1311(b)(2)(E).[1]

27.    Accordingly, the MSGP requires permittees to use BMPs that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT"), for toxic and non-conventional pollutants and best conventional pollutant control

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

technology ("BCT") for conventional pollutants. *See* 60 Fed. Reg. at 50812.

28.    The MSGP also requires dischargers to develop and implement a storm water pollution prevention plan ("SWPPP"). MSGP § IV. Among other things, the SWPPP records the BMPs applied at a particular industrial facility. Sector N facilities must develop and implement a SWPPP that comports with several requirements of Part XI.N of the MSGP. Through the SWPPP, requirements in Part XI.N of the MSGP implement its BAT/BCT requirements for Sector N facilities by requiring that the pollution prevention plan minimize pollution and requiring specific BMPs to effectuate such minimization. *See* MSGP Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT.")

29.    The MSGP provides that: "[T]he plan shall describe and ensure the implementation of practices that are to be used to reduce the pollutants in storm water discharges associated with industrial activity at the facility and to assure compliance with the terms and conditions of this permit. Facilities must implement the provisions of the storm water pollution prevention plan required under this part as a condition of this permit." MSGP § IV, 60 Fed. Reg. at 51115.

30.    Facilities subject to Sector N must include, *inter alia*, the following in their SWPPPs: (1) identification of all the members of a storm water pollution prevention team responsible for developing and implementing the SWPPP; (2) a description of potential pollutant sources; (3) a site map including, *inter alia*, outfall locations, types of discharges in the drainage areas, location where significant materials are exposed to precipitation, monitoring locations, and flow directions; (4) an inventory of the types of materials at the site that may be exposed to precipitation; (5) a list of significant spills and leaks of toxic or hazardous pollutants that occurred at areas that are exposed to precipitation; (6)

a summary of existing discharge sampling data; (7) a narrative description of potential pollutant sources from various activities; (8) a description and implementation of appropriate storm water management controls (including various specific requirements); (9) spill prevention and response measures; (10) a quarterly inspection program; and (11) an employee training program. MSGP §§ XI.N.3.a(1), XI.N.3.a(2)(a)-XI.N.3.a(2)(e), XI.N.3.a(3)(a)(i)-XI.N.3.a(3)(a)(xii) (requirements for scrap and waste recycling facilities (nonsource-separated, nonliquid recyclable wastes)).

31.     Part XI.N.3.a(3)(a) of the MSGP requires that Sector N facilities develop and implement appropriate storm water management controls including the following:

- Measures and controls to "minimize contact of storm water runoff with stockpiled materials, process materials, and nonrecyclable wastes," as well as "measures to minimize the extent of storm water contamination from those areas." The facility operator must consider using the following BMPs or their equivalents: diversion of runoff, media filtration, silt fencing, and oil/water separators, sumps, and dry adsorbents. Part XI.N.3.a(3)(a)(ii).

- "[M]easures necessary to minimize contact of surface runoff with residual cutting fluids." This includes a requirement to consider implementing one of two (or a combination) types of measures – either storage of turnings under cover or a dedicated containment area for turnings. Part XI.N.3.a(3)(a)(iii).

- "[M]easures and controls to minimize residual liquids and accumulated particulate matter, originating from scrap and recyclable waste materials stored indoors or under cover, from coming in contact with surface runoff." This part requires that dischargers consider including various housekeeping measures. Part XI.N.3.a(3)(a)(iv).

- Address "areas where scrap and waste processing equipment are sited" by adopting "measures and controls to minimize surface runoff from coming in contact with scrap processing equipment." Part XI.N.3.a(3)(a)(v).

- Provide appropriate source control, stabilization measures, nonstructural, structural controls or equivalent for areas at the facilities that are associated with industrial activity that have a high potential for soil erosion and suspended solids loadings. This requires consideration of a variety of erosion and sediment control BMPs. Part XI.N.3.a(3)(a)(vii).

60 Fed. Reg. at 51190–93 (detailing specific requirements for facilities processing non-liquid recyclable waste.

32.    In addition to requiring that permittees select and install BMPs and develop a SWPPP to meet the Clean Water Act's standards, the MSGP also requires facility operators to implement monitoring and reporting requirements that allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

33.    Sector N permittees must monitor their storm water discharges at least quarterly during the second and fourth year within a five-year permit "term." They must provide "the date and duration (in hours) of the storm event(s) sampled; rainfall measurements or estimates (in inches) of the storm event that generated the sampled runoff; the duration between the storm event sampled and the end of the previous measurable (greater than 0.1 inch rainfall) storm event; and an estimate of the total volume (in gallons) of the discharge sampled." MSGP §§ XI.N.5.a.

34.    The MSGP requires Sector N permittees to collect samples "from the discharge resulting from a storm event that is greater than 0.1 inches in magnitude and that occurs at least 72 hours from the previously measurable (greater than 0.1 inch rainfall) storm event." *Id*. In other words, the permittee must collect a sample from a "measurable storm" (> 0.1") after at least three days with no "measurable storm" (≤ 0.1").

35.    The MSGP requires Sector N permittees to take quarterly sample and make visual observations of representative storm water discharges. MSGP § XI.E.5.c, XI.P.4.a(1). Dischargers must document their observations of color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, and other obvious indicators of storm water pollution at each discharge location.

36.    The MSGP requires that Sector N facilities conduct, at a minimum once per year, comprehensive site compliance evaluations, include those evaluations in the SWPPP, and revise storm water pollution prevention measures and controls accordingly based on the results of those evaluations. MSGP § XI.N.3(a)(4).

37.    For Sector N facilities, the MSGP establishes the following cut-off concentrations for pollutants of concern: chemical oxygen demand ("COD") – 120 mg/L, total suspended solids ("TSS") – 100 mg/L, total recoverable aluminum – 0.75 mg/L, total recoverable copper – 0.0636 mg/L, total recoverable iron – 1.0 mg/L, total recoverable lead – 0.0816 mg/L, total recoverable zinc – 0.117 mg/L.  MSGP, § XI.N.5.a; 61 Fed. Reg. 5248 (February 9, 1996) (amending cut-off concentration for zinc).

38.    The cut-off concentrations are used "to assess the effectiveness of the pollution prevention plan and to help ensure that a reduction of pollutants is realized." 60 Fed. Reg. at 50843 (Monitoring and Reporting Requirements). They "provide a reasonable target for controlling storm water contamination by pollution prevention plans." *Id*. at 51076.

39.    The cut-off concentrations are guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures. Further, exceedances of cut-off concentrations are reason for concern that pollution may have reached a level "at which a storm water discharge could potentially impair, or contribute to impairing water quality or affect human

health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

40.    The MSGP does not provide for any mixing zones by dischargers.

41.    The MSGP does not provide for any receiving water dilution credits to be applied by dischargers.

42.    Part XI.N(2)(a)(1)(a) of the MSGP prohibits discharges of material other than storm water ("non-storm water discharges") to waters of the United States, or through municipal separate storm sewer systems. Water sprayed for dust suppression is not of the enumerated permitted non-storm water discharges list in Part XI.N(2)(a)(1)(b) of the MSGP.

**Beneficial Uses of Florida Surface Waters**

43.    The State of Florida has identified beneficial uses and designated all surface waters of the State of Florida as Class III – Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife, except for certain waters which are described in subsection 62-302.400(16), F.A.C. Rule 62-302.400(15), F.A.C. "Class I, II, and III surface waters share water quality criteria established to protect fish consumption, recreation and the propagation and maintenance of a healthy, well-balanced population of fish and wildlife." Rule 62-302.400(4), F.A.C.

**Receiving Waters and Associated Impairments**

44.    Sarasota Bay has exceptional recreational and ecological significance. Pollution from the Facility damages habitat for commercial fishing and sport fishing, estuarine habitat and wildlife habitat that supports fish migration, fish spawning, preservation of rare and endangered species, shellfish propagation, contact and non-contact water recreation and navigation. These waterways are part of the Sarasota Bay Estuarine System, which is designated as a "Special Water" having been found to have exceptional recreational or

ecological significance and that the environmental, social, and economic benefits of the designation outweigh the environmental, social, and economic costs (Rule 62- 302.700(5), F.A.C.).

45.    The Sarasota Bay Estuarine System is also afforded special significance and protection as an "Outstanding Florida Water," pursuant to 62-302.400 F.A.C.

46.    Sarasota Bay is impaired for bacteria.

47.    Hog Creek is impaired for mercury.

## V.    STATEMENT OF FACTS

### Metal Recycling Facilities

48.    Metal recycling facilities, especially those with outdoor stockpiling, processing and segregation of materials, have been identified as a major source of storm water contamination. Scrap metal in different stages of corrosion and decay may release a variety of harmful substances including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical residues. 60 Fed. Reg. 50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995).

49.    In addition to the storage and processing of various sources of metal, metal recycling facilities also conduct vehicle operation and maintenance and equipment operation and storage. Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises. Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

### Concrete Crushing Facilities

50.    Concrete crushing and recycling is associated with a host of potential stormwater pollutants and discharges. Crushing or fracturing hardened

concrete during recycling processes exposes unreacted quicklime or cement. When water contacts the unreacted quicklime or cement, chemical reactions occur that result in high pH. Stormwater, erosion, and movement within the stockpile can continuously expose new potential reaction sites. The American Concrete Pavement Association noted in their 2009 Engineering Bulletin on Recycling Concrete Pavements that engineers should be aware of the highly alkaline nature of recycled concrete aggregates, the relatively high degree of solubility of the hydroxide-bearing components of the material, and the potential increases in pH that could occur in water percolating through recycled concrete.

**Storm Water Pollution at the Facility**

51.    Defendant owns and/or operates the Facility, a scrap and concrete recycling and concrete manufacturing facility located in Sarasota, FL.

52.    Based on Plaintiff's investigation, including a review of the Facility's Notice of Intent to Use Multi-Sector Generic Permit for Storm Water Discharge Associated With Industrial Activity ("NOI"), aerial photography, and Plaintiff's information and belief, Plaintiff alleges that storm water is collected and discharged from the Facility via at least three outfalls.

53.    Storm water discharged from the Facility flows into the Sarasota municipal separate storm sewer system and then discharges to Hog Creek and the Sarasota Bay (collectively, "Receiving Waters").

54.    The Receiving Waters are waters of the United States.

55.    The Facility's current coverage under the MSGP is active from November 15, 2021, through November 14, 2026.

56.    Defendant has certified that the Facility is classified under SIC Code 5093, meaning that it is primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials. Significant industrial activities at the Facility take place outdoors, where pollutants are exposed to

15

storm water.

57.    Part XI.N of the MSGP is divided into three separate classes of recycling facilities. The Facility falls under the initial category: "scrap recycling and waste recycling facilities (non-liquid recyclable waste)."

58.    On information and belief, Plaintiff alleges that the Facility releases the following pollutants into the immediate environment: metals such as aluminum, iron, zinc; as well as nitrates, nitrites, suspended solids, and pH-altering substances.

59.    On information and belief, Plaintiff alleges that other significant potential pollutant sources at the Facility include metal scraps, concrete waste, and heavy metals.

60.    The large number of trucks and other vehicles entering and leaving the Facility from the driveways track pollutants off-site onto public streets where rainfall washes these pollutants into storm drains that discharge into the Receiving Waters.

61.    On information and belief, Plaintiff alleges that storm water flows over the surface of the Facility where industrial activities occur including, but not limited to, receiving materials, concrete manufacturing and recycling, processing of metals, maintenance of forklifts and equipment and areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground. Plaintiff is informed and believes and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the Facility's storm water discharge locations.

62.    On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contains storm water that is commingled with runoff from areas at facility where industrial processes occur.

63.     Since 2023, Waterkeeper has collected and analyzed samples of storm water flows from the channel in front of the Facility as well as from flows near the Facility's driveways. These samples have contained concentrations of aluminum, iron, TSS, and COD well in excess of the applicable cut-off concentrations for those parameters.

**Failure to Implement BAT/BCT at the Facility**

64.     As noted above, MSGP permittees must limit pollution in industrial storm water to a level commensurate with the federal BAT and BCT standards; develop and implement SWPPPs that set forth the best management practices that the permittee is using to meet those federal standards; conduct routine inspections and monitoring, and accurately report the results of that monitoring.

65.     On information and belief, Plaintiff alleges that Defendant has failed to develop and/or implement sufficient BMPs at the Facility to limit pollution in industrial storm water to a level commensurate with the federal BAT and BCT standards as follows:

      a.  The Facility does not prevent storm water flows from coming into contact with the sources of contaminants.

      b.  The Facility lacks sufficiently well-maintained structural controls and practices to minimize exposure of pollutants to storm water, to retain all storm water on site; or to prevent contaminants from entering into storm water.

      c.  Defendant does not sufficiently treat contaminated storm water prior to discharge from the Facility.

66.     On information and belief, Plaintiff alleges that since at least November 15, 2021, Defendant has failed to implement BAT and BCT at the Facility for its discharges of aluminum, iron, TSS, COD, and potentially other pollutants. As of the date of this Complaint, Defendant has failed to implement

BAT and BCT.

67.    As a result of Defendant's practices at the Facility, storm water containing excessive pollutants is being discharged from the Facility during rain events into the Receiving Waters.

68.    Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

**SWPPP Violations at the Facility**

69.    On information and belief, Plaintiff alleges that since at least November 15, 2021, Defendant has failed to develop and/or implement an adequate SWPPP at the Facility in accordance with the requirements of Part XI.N.3 of the MSGP.

70.    The SWPPP for the Facility does not include, and Defendant has not implemented, the required minimum and industry specific BMPs necessary to reduce pollutant levels in discharges to BAT and BCT levels. This includes, but is not limited, sufficient structural controls. This is evidenced by sources of storm water contamination at the Facility, contaminant tracking around and off the Facility, and the Facility's discharges of storm water contaminated above pollutant levels without the requisite application of BAT/BCT.

71.    In addition, the Facility's September 19, 2002 SWPPP specifically fails to comply with the MSGP in the following ways:

     a.  Failure to indicate the holding pond near the NW corner of the site on the site map. Part XI.N.2(a)(i).

     b.  Failure to include inventory of exposed materials. Part XI.N.2(b).

     c.  Failure to include sampling data. Part XI.N.2(d).

    d.   Failure to consider use of BMPs to promote diversion of runoff. Part XI.N.3(a)(3)(a)(ii)(a).

    e.   Failure to consider use of media filtration. Part XI.N.3(a)(3)(a)(ii)(b).

    f.   Failure to describe good housekeeping and preventive maintenance measures to minimize contract of runoff with accumulated particulate matter from processing equipment. Part XI.N.3(a)(3)(a)(v)

72.    U.S. Recycling's failure to prepare and/or implement an adequate SWPPP in all the above respects constitute violations of the MSGP. As a result, the discharges of storm water associated with industrial activity from the Facility are not in accordance with the effluent limitations contained in Defendant's NPDES permit, and therefore Defendant is violating Sections 301 and 402 of the Clean Water Act at the Facility.

**Monitoring Violations at the Facility**

73.    On information and belief, Plaintiff alleges that since November 15, 2021, U.S. Recycling has failed to develop and/or implement an adequate monitoring and reporting program at the Facility in accordance with the requirements of Part XI.N.5 of the MSGP.

74.    First, Plaintiff is informed and believes, and thereupon alleges that Defendant has failed to collect and analyze storm water discharges from both of the ingress/egress (driveway) outfalls at the Facility during all four quarters of 2022 and 2024. Plaintiff alleges that numerous sufficient storm events that would have produced discharges at the Facility occurred during these periods. These dates are set forth in Plaintiff's notice letter.

75.    Second, Plaintiff alleges that U.S. Recycling has failed to take quarterly storm water samples and make visual observations of representative storm water discharges from both of the driveway outfalls since November 15,

2021.

### Prohibited Non-Storm Water Discharges

76.     On August 20, 2025, Sarasota County conducted an air quality inspection of the property where the Facility is located.

77.     Photos attached to the inspection report show U.S. Recycling discharging non-storm water from one of the entrances to the Facility. This water was associated with the use of a water truck associated with dust suppression. The discharges flowed to the channel in front of the Facility, which ultimately flows to the Receiving Waters.

78.     Water associated with dust suppression is a non-storm water discharge prohibited by the MSGP.

79.     Plaintiff is informed and believes, and thereupon alleges that U.S. Recycling violates Part XI.N(2)(a)(1)(a) of the MSGP each time it discharges non-storm water from the Facility. These violations are ongoing.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

80.     Plaintiff incorporates and re-alleges paragraphs 1-32, 37-41, and 43-68 as if fully set forth herein.

81.     The MSGP's SWPPP requirements oblige Sector N dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement BAT and BCT at the Facility for its discharges of aluminum, iron, TSS, COD, and potentially other pollutants in violation of Part XI.N of the MSGP.

82.     Each day since November 15, 2021, that Defendant has failed to develop and implement BAT and BCT in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

83.     Defendant has been in violation of the BAT/BCT requirements every day since November 15, 2021. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update Adequate Storm Water Pollution Prevention Plan
### (Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)

84.     Plaintiff incorporates and re-alleges paragraphs 1-79 as if fully set forth herein.

85.     The MSGP requires Sector N dischargers to develop, implement, and revise an adequate SWPPP.

86.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP is evidenced by, *inter alia*, the SWPPP's failure to include various information required by the MSGP.

87.     Each day since every day since November 15, 2021, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

88.     Defendant has been in violation of the SWPPP requirements every day since November 15, 2021. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**THIRD CAUSE OF ACTION**
**Failure to Develop and Implement**
**Adequate Monitoring and Reporting Program**
**(Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

89.    Plaintiff incorporates and re-alleges paragraphs 1-41, 43-63. 71, and 73-75 as if fully set forth herein.

90.    The MSGP requires Sector N facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

91.    Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.

92.    Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program is evidenced by, *inter alia*, its failure to collect, analyze, and record visual observations of storm water discharges from the driveway outfalls at the Facility.

93.    Each day since at least March 31, 2022, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results is an ongoing and continuous violation of the Act.

**FOURTH CAUSE OF ACTION**
**Prohibited Non-Storm Water Discharges**
**(Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

94.    Plaintiff incorporates and re-alleges paragraphs 1-24, 26, 42-47, and

76-79 as if fully set forth herein.

95.    The MSGP prohibits discharges of material other than storm water.

96.    Since at least August 20, 2025, Defendant has discharges non-storm water to waters of the United States.

97.    Every day that Defendant discharges non-storm water is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

## VII.  RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the MSGP;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the MSGP;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to comply with the MSGP's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendant to prepare a SWPPP for the Facility consistent with the MSGP's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant to provide Plaintiff with reports documenting

the quality and quantity of its discharges to waters of the United States and its efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of up to $68,445 per day per violation pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.  Award any such other and further relief as this Court may deem appropriate.

Dated: December 5, 2025

<div style="margin-left:35%;">

Respectfully submitted,

By:     _/s/ Douglas Chermak_____

Douglas Chermak
Florida Bar #1066626
Super Law Group, LLC
222 Broadway, 22nd Floor
New York, NY 10038
Telephone: (212) 242-2355
Facsimile: (855) 242-7956
Email: doug@superlawgroup.com
*Lead Counsel for Plaintiff* SUNCOAST
WATERKEEPER

By:     _/s/ Justin Bloom_____
Justin Bloom
Florida Bar #89109
Justin Bloom Attorney at Law, PA

</div>

P.O. Box 1028
Sarasota, FL 34230
Telephone: (941) 275-2922
Facsimile: (866) 564-2169
Email: bloomesq1@gmail.com
*Attorney for Plaintiff* SUNCOAST
WATERKEEPER